Suzy C. Moore, State Bar No. 151502
LAW OFFICES OF SUZY C. MOORE
8411 La Mesa Boulevard
La Mesa, CA 91942
Telephone: (619) 469-9690
suzymoore@lawyer.com

Attorney for Plaintiffs
B.J. FOSTER and ADAM ELLIS

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

B.J. FOSTER and ADAM ELLIS,

Plaintiffs,

v.

BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, JENNIFER MILO, TODD SNEDDEN, ANDREA LEONARD, MORAD SHAH, VIRIDIANA DIAZ, and ADAM GORDON, in their individual and official capacities, RENAISSANCE SEARCH AND CONSULTING LLC, and DOES 1 through 10, inclusive,

Defendants.

Case No. 3:24-cv-01917-LL-SBC

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date: December 9, 2026
Judge: Hon. Linda Lopez

PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT

Action Filed: August 28, 2024
Trial Date: TBD

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

- A. Milo favored the women's programs and disparately treated the men's basketball coaches ........ 2
- B. The bid ........ 6
- C. The men's team's protest and Plaintiffs' complaints ........ 8
- D. The March 10, 2022 confrontation ........ 10
- E. Leonard's campaign against Plaintiffs after the protest ........ 11
- F. Retaliation after the complaints ........ 12
- G. Foster's constructive discharge ........ 16
- H. The denial of the interim head coaching position and the outside search ........ 18

III. LEGAL STANDARD ........ 21

IV. ARGUMENT ........ 22

- A. Defendants' Motion Disregards Plaintiffs' Theory of the Case and the California Case Law Requiring Evaluation of the Totality of the Circumstances ........ 22
- B. Triable Issues Exist on Plaintiffs' FEHA Retaliation Claim (Third Cause of Action) ........ 23
  - 1. The totality of the circumstances demonstrates that Defendants' retaliatory actions affected the terms and conditions of Plaintiffs' employment ........ 23
  - 2. Causation: direct evidence and an unbroken chain of

inference........................................................................24
3. Defendants' "legitimate reasons" are disputed on this record........................................................................26
C. Triable issues exist on the sex discrimination claim (First Cause of Action)........................................................................27
D. Triable issues exist on the hostile environment harassment claim (Seventh Cause of Action)............................................30
E. Triable issues exist on Ellis's race discrimination claim (Sixth Cause of Action)........................................................................32
F. Whether Plaintiffs were constructively discharged is a question of fact........................................................................34
G. Triable Issues Exist on the Failure to Prevent Discrimination and Retaliation Claim, and the CSU’s Failure to Investigate and Correct Independently Supports It (Second Cause of Action). 36
H. Triable issues exist on the Section 1983 First Amendment claim (Eighth Cause of Action)........................................................37
1. Plaintiffs engaged in protected speech...........................37
2. Protected speech was a substantial or motivating factor, and each individual defendant participated....................40

V. CONCLUSION........................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917 (9th Cir. 2004)............37
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................21
*Beyda v. City of Los Angeles*, 65 Cal. App. 4th 511 (1998)..........................32
*Casenas v. Fujisawa USA, Inc.*, 58 Cal. App. 4th 101 (1997)......................35
*Chuang v. University of California Davis*, 225 F.3d 1115 (9th Cir. 2000).23, 25
*Colores v. Board of Trustees of California State University*, 105 Cal. App. 4th 1293 (2003)..........................................................................34
*Connick v. Myers*, 461 U.S. 138 (1983)......................................................37
*Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003).......................22, 40
*Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013) (en banc).....................38
*DeJung v. Superior Court*, 169 Cal. App. 4th 533 (2008)......................21, 25
*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009)............................................37
*Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590 (1989). 23, 30
*Garcetti v. Ceballos*, 547 U.S. 410 (2006)..................................................38
*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998)......................21
*Hersant v. Department of Social Services*, 57 Cal. App. 4th 997 (1997)23, 27
*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977)..........................................................................28
*Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978)..........................................40
*Johnson v. Multnomah County*, 48 F.3d 420 (9th Cir. 1995).......................38
*Johnson v. United Cerebral Palsy/Spastic Children's Foundation*, 173 Cal. App. 4th 740 (2009)..........................................................................28
*Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741 (9th Cir. 2001)..........................................................................40

*Lane v. Franks*, 573 U.S. 228 (2014)........................................................38
*Lyle v. Warner Bros. Television Productions*, 38 Cal. 4th 264 (2006).........31
*Miller v. Department of Corrections*, 36 Cal. 4th 446 (2005).......................31
*Morgan v. Regents of University of California*, 88 Cal. App. 4th 52 (2000)23
*Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243 (2009).................21, 29
*Northrop Grumman Corp. v. Workers' Compensation Appeals Board*, 103 Cal. App. 4th 1021 (2002)................................................................36
*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)..............31
*Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121 (9th Cir. 2008)...........................................................................................38
*Raines v. U.S. Healthworks Medical Group*, 15 Cal. 5th 268 (2023)...........33
*Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95 (2004).................26, 33
*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)...........27
*Reid v. Google, Inc.*, 50 Cal. 4th 512 (2010).........................................22, 29
*Reno v. Baird*, 18 Cal. 4th 640 (1998)........................................................30
*Roby v. McKesson Corp.*, 47 Cal. 4th 686 (2009)........................................30
*Spence v. Washington*, 418 U.S. 405 (1974)................................................39
*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011)..............................................40
*State Department of Health Services v. Superior Court*, 31 Cal. 4th 1026 (2003)........................................................................................... 30
*Staub v. Proctor Hospital*, 562 U.S. 411 (2011)........................................26
*Steele v. Youthful Offender Parole Board*, 162 Cal. App. 4th 1241 (2008)..34
*Taylor v. City of Los Angeles Department of Water & Power*, 144 Cal. App. 4th 1216 (2006)......................................................................36
*Texas v. Johnson*, 491 U.S. 397 (1989).......................................................39
*Thompson v. Tracor Flight Systems, Inc.*, 86 Cal. App. 4th 1156 (2001).....34
*Trujillo v. North County Transit Dist.*, 63 Cal. App. 4th 280 (1998)............36
*Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238 (1994)........................34, 35

*Valdez v. City of Los Angeles*, 231 Cal. App. 3d 1043 (1991)......................34

*Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028 (2005)...........22, 23, 24, 25

**Statutes**

42 U.S.C. § 1983..........................................................................22, 37, 40

Cal. Gov't Code § 12926(d)..................................................................33

Cal. Gov't Code § 12923................................................................21, 30, 32

Cal. Gov't Code § 12940(a)..................................................................28

Cal. Gov't Code § 12940(j)...............................................................30, 31

Cal. Gov't Code § 12940(k)..................................................................36

**Rules and Regulations**

Fed. R. Civ. P. 56..............................................................................27

Cal. Code Regs. tit. 2, § 11023...............................................................37

# I. INTRODUCTION

Defendants' motion takes the events of five years, cuts them into a dozen pieces, and asks the Court to hold that each piece, standing alone, is not an "adverse employment action" or has a "legitimate" explanation. That is not how the law in California interprets FEHA hostile environment and retaliation claims. California courts use a legal analysis method referred to as the "totality of the circumstances" in which the decision-maker evaluates all relevant facts, context and contributing factors together rather than in isolation. The evidence in this case overwhelmingly demonstrates that Athletic Director Jennifer Milo ran a department in which the women's programs were preferentially treated and the men's basketball program, including its coaches B.J. Foster and Adam Ellis, was disparately treated. Despite the men's basketball team having the best season in school history, Athletic Director Milo refused even to submit the paperwork that would have let them host the NCAA regional, while she submitted it for the women. When the players protested and their coaches reported the inequity to the Vice President and the Title IX office, Milo, Todd Snedden and Andrea Leonard confronted them in front of several hundred people and then spent the next year threatening and punishing them through their evaluations, their recruits, their scholarship money, and their standing in the department. After Head Coach B.J. Foster finally left, CSUSM refused to give Assistant Coach Adam Ellis the Interim Head Coach position it had given every comparable assistant, and hired the first outside search firm in school history, because, in the words of Defendants' own declarant, Ellis had raised a legal claim of retaliation and that was a "red flag."

Defendants' motion never engages with any of Plaintiffs' theories. It does not mention that Milo told the head coaches she "would sure love to hire a woman" for the men's basketball job, that she only yelled at the men's

coaches, that she stayed for the women's games and left before the men's, or that the Head Women's Basketball Coach, Renee Jimenez, told Plaintiffs she got things the men's program could not "because she was a female." The Motion does not mention Milo's recommendations that Plaintiffs receive reprimands with threats of termination or that Snedden's written evaluations criticized both coaches for supporting the players' decision to boycott the pep rally. The Motion does not reference the increased hostility Plaintiffs were subjected to by Milo and her staff putting up additional roadblocks with transfers and scholarships, causing Foster and Ellis to lose valuable recruits to their program. The Motion disregards the fact that CSUSM allowed Jennifer Milo to continue to retaliate for eighteen months while the investigation was pending, affecting the terms and conditions of Plaintiffs' employment. The Motion ignores similarly situated male coaches who were also compelled to resign due to the hostile environment and all witnesses who corroborated in the investigation that there was disparate treatment and favoritism toward the female coaches. The motion should be denied.

## II. STATEMENT OF FACTS

"Ex." refers to the exhibits to the Moore Declaration; depositions are cited by exhibit, witness, and page:line.

### A. Milo favored the women's programs and disparately treated the men's basketball coaches

Milo was CSUSM's Athletic Director from 2012 until the investigation of Plaintiffs' complaints was completed 18 months later, at which time she was placed on administrative leave and then removed from her position due to concerns about her leadership. Andrea Leonard was also stripped of her title as Senior Woman Administrator. During the investigation, Morad Shah became the Acting Athletic Director. (Ex. 10 (Diaz) 13:21-17:18, 96:9-16; Ex. 3 (Milo I) 12:6-13:24; Ex. 8 (Shah)

115:24-118:3.) Milo openly favored the women's coaches and programs. Women's Head Basketball Coach Renee Jimenez, who interacted with Foster and Ellis nearly every day, observed that Milo treated them with hostility, "as if they were a problem to be managed," and was more hostile to them than to her. The women's program was generally told "yes" to requests where the men's program was told "no," including travel arrangements, transfers and the admission of recruits, and Foster more than once asked Jimenez to make a request first because if Milo said yes to her there was a better chance she would say yes to the men. (Jimenez Decl. ¶¶ 5-8; Ex. 2 (Ellis) 164:5-168:20.)

Although men's and women's basketball received equal resources on paper, in practice the women's team received more favorable treatment. (Jimenez Decl. ¶ 8.) Former assistant men's coach Kevin Williamson observed that the women's coaches were treated with kid gloves and were not held to the same standards in recruiting, admissions and compliance paperwork, while requests from men's basketball were pushed off or ignored and Foster was treated like a second-rate citizen. (Williamson Decl. ¶¶ 5-6.) Before Plaintiffs complained in March 2022, Jimenez had written to and met with President Ellen Neufeldt and Vice President Diaz about Milo's leadership, including Milo giving Leonard the Senior Woman Administrator position without a competitive process and recruiting bias against men's basketball recruits. (Jimenez Decl. ¶ 10.) In 2019, Williamson told Human Resources in writing that he was resigning because of the preferential treatment of the women's coaches and programs, the environment Milo created, and the obstacles placed in the way of the men's program. (Williamson Decl. ¶ 8.) Former Head Coach Jim Saia also left because of the hostile environment. (Saia Decl. ¶¶ 4-6.)

Milo's discriminatory treatment of Foster started after he was hired as

the Head Coach after he had spent three years as the Assistant Coach and thereafter the Interim Coach. Foster described that throughout the years, Milo was never supportive, yelled and talked down to him, always looked for a fight and had no interest in working together. Foster indicated that it got to the point where he went and saw a therapist due to the anxiety that he was experiencing. (Ex. 39.) Milo announced at a Head Coaches' meeting, with Foster present, that she "would sure love to hire a woman for the men's basketball coach position." (Ex. 1 (Foster) 36:8-11, 39:11-40:6.) She yelled at Foster and other men's coaches, never at a woman coach; and Foster testified that "the only people [he] heard that cried were men coaches." (Ex. 1 (Foster) 109:25-113:5, 118:8-119:21.) In a March 2019 coaches' meeting, Milo said, looking at Foster, "If there's a cancer ... then you need to leave." Foster's notes record "Buy in or get out", leaving two male coaches in tears. Milo used profanity, called the men's coaches a "cancer" or "rogue" yearly and made "passive-aggressive" digs at them in monthly staff meetings. Both Foster and Ellis were affected emotionally by Milo's conduct toward them, which affected their employment. (Ex. 1 (Foster) 122:18-128:20; Ex. 39; Ex. 2 (Ellis) 46:21-48:20, 301:15-303:6; Ex. 6 (Snedden) 113:3-20, 127:11-16; Ex. 3 (Milo I) 74:14-22.)

Milo stayed for the women's games and left before the men's played, to the point that the men's players asked why the Athletic Director "hated them." Milo wouldn't support the men's basketball team and would not even acknowledge the male players when she walked down the hallway. Milo concedes she may have exhibited some frustration toward the men's basketball team in her body language. (Ex. 2 (Ellis) 42:18-44:11; Ex. 13 (Nathanson) 27:2-28:8, 30:1-11; Ex. 10 (Diaz) 30:9-32:12; Paniagua Decl. ¶ 5; Jimenez Decl. ¶ 6; Sutton Decl. ¶ 2; Seits Decl. ¶ 8; Ex. 4 (Milo II) 126:4-7.) The men's team traveled in vans while the women's team traveled by

bus, and the men ate fast food while the women's team ate at restaurants. (Sutton Decl. ¶ 2; Ex. 10 (Diaz) 30:9-31:6.) In December 2021, with Foster quarantined and two players positive, Snedden refused to postpone a trip and sent the men with seven players in a van; the women took a bus on the same trip. "[E]veryone got COVID." (Ex. 1 (Foster) 180:11-185:22; Ex. 6 (Snedden) 128:8-25.)

Women's basketball started with about $120,250 in scholarship money and men's basketball about $111,250, placing men's basketball 10th to 12th of 12 in the conference while women's basketball was 5th. Foster alone had to fundraise for scholarships to compete, and Nathanson told him the department would be out of Title IX compliance without his fundraising. (Ex. 1 (Foster) 74:16-77:17, 79:20-80:21, 209:6-211:11; Ex. 3 (Milo I) 59:4-11; Ex. 6 (Snedden) 92:14-93:20.) After a one-time $100,000 donor gift to women's programs ended, the women's allocations stayed at the elevated level while men's fundraised dollars were subjected to a multi-step approval process; Nathanson found this "odd." (Ex. 13 (Nathanson) 55:18-59:11; Ex. 37.)

The Transfer Review Committee (Milo, Snedden, Leonard, Stock, Nathanson) was "started because of men's basketball." Nathanson, a member, testified that scrutiny was "specifically for men's basketball," the "benefit of the doubt" differed by sport, and the committee was designed so that "the more hoops someone has to jump through," the more likely "the coach eventually just says it's not worth it." (Ex. 1 (Foster) 52:10-18, 61:12-62:13, 283:3-285:3; Ex. 13 (Nathanson) 45:10-47:19, 53:23-54:14, 82:10-84:18.) The Committee was eliminated on January 1, 2023, during the investigation. (Ex. 4 (Milo II) 209:2-7.) In the Transfer Committee, male recruits were held to standards not applied to female recruits: Greg Milton was denied on a 3.0 standard no coach had been told of; Ezekiel Alley was

called a “cheater” for retaking a class, the men’s team lost him to another school, and he went on to Division I; Huang had to take a summer course while a women’s basketball player missing the same course was admitted and “received the benefit of the mistake”; Snedden asked whether Sutton would “fit into the program” because he was married. (Ex. 1 (Foster) 283:3-287:23; Ex. 13 (Nathanson) 45:10-51:2; Ex. 6 (Snedden) 60:7-63:16, 108:14-110:16; Williamson Decl. ¶ 7.) David Nathanson, the department’s admissions director, told investigators Milo “absolutely” favored the women’s teams. (Ex. 13 (Nathanson) 36:11-37:20, 65:23-67:3.)

Milo personally denied COVID retests for men’s players; the men’s requests “never made it to the doctor”; those decisions were “decided by Jen and Chris [Drumm],” the COVID nurse. Softball players and the softball coach were allowed to retest. (Ex. 1 (Foster) 164:8-168:10; Ex. 2 (Ellis) 273:5-276:13; Ex. 13 (Nathanson) 15:8-16:20, 64:4-17.) Milo had a personal relationship with Drumm. (Ex. 3 (Milo I) 64:11-20.) Milo made Leonard, with whom she had a personal relationship outside work, Senior Woman Administrator with a $25,000 stipend without posting the position. (Ex. 3 (Milo I) 60:18-62:24; Ex. 11 (Leonard) 19:8-26:17; Ex. 8 (Shah) 60:7-16; Jimenez Decl. ¶ 10.)

**B. The bid**

The men’s team was considered for the bid by Morad Shah but not by Jennifer Milo. On January 14, 2022, Morad Shah, CSUSM’s facilities director, emailed that men’s basketball was “ranked ninth in the country” and that “there [was] a good chance [they] would need to host the regional NCAA tournament for men’s basketball,” and reserved the sports center for March 9-14, 2022. (Ex. 8 (Shah) 33:17-34:25; Ex. 18.) However, Milo had weekly conversations with women’s coach Renee Jimenez about the bid but never spoke with Foster about it. Foster and Ellis were not consulted before

the deadline passed. (Ex. 3 (Milo I) 87:19-88:12; Ex. 8 (Shah) 47:23-48:7; Ex. 6 (Snedden) 28:3-11; Ex. 1 (Foster) 239:5-20.)

Before the men's deadline, Associate Athletic Director Todd Snedden sent Shah "back in" to persuade Milo to bid for the men; Shah returned saying "she wasn't changing her mind." Snedden testified he was devastated about the decision and cried over it, told investigators "I regret not making that decision," and testified the men's bid "was the right thing to do." (Ex. 6 (Snedden) 12:22-13:19, 14:21-15:17, 17:1-3, 131:16-133:9.) Shah then asked Snedden, "Should we submit the bid anyway?" Snedden would not go against his boss. He never told Milo the men's bid should be made, because "[s]he made the decision. I needed to support that," and he told investigators, "I'm not the person that goes against the grain." (Ex. 6 (Snedden) 15:2-9, 16:16-24, 132:1-133:9.)

The men were in the stronger position for a No. 1 seed. The men were ranked third in the West Region and the women fourth, and the two teams ranked above the men were CCAA teams they would have to beat to win the conference tournament, which would guarantee the top seed, while the women needed to win their tournament and have two other conference leaders lose. (Ex. 2 (Ellis) 170:4-173:11; Ex. 1 (Foster) 229:19-235:1; Ex. 6 (Snedden) 27:17-28:2.) Milo claims not to have known the NCAA "split regional" rule, in place since 2014, under which both teams could have hosted. Foster, Jimenez and Leonard knew it; VP Diaz, "not a subject expert in athletics," immediately asked "what happens if they both got No. 1?" (Ex. 3 (Milo I) 84:1-20; Ex. 1 (Foster) 236:4-21, 236:25-237:19, 239:5-20; Ex. 10 (Diaz) 26:5-18.) The men learned of the decision the night before the CCAA championship game, in a group text from Milo. She wrote that "we did not put in a bid," complained that Ellis was telling people "one more win and we are hosting regionals," and demanded, "This has to stop, and we

need to be honest." Foster answered, "Seems like a conversation Todd or you should have brought up with me. I don't get emails about hosting regional or bids." (Ex. 1 (Foster) 214:3-215:10; Ex. 2 (Ellis) 199:17-204:8; Ex. 16; Ex. 3 (Milo I) 99:20-100:9.)

The men won the CCAA championship, finished as the West Region's No. 1 seed, were the only No. 1 seed not hosting, and lost their first-round game at Cal State San Bernardino. (Ex. 2 (Ellis) 214:1-219:5; Ex. 1 (Foster) 215:23-217:1; Ex. 6 (Snedden) 134:4-14; Seits Decl. ¶ 3; Sutton Decl. ¶ 4.) The CSU's own summary of the bid, prepared for the Title IX Coordinator on March 12, 2022, shows the men's bid was not due until February 28, 2022, a week after the women's bid was submitted on February 21. On their deadline, the men were 17-4 and ranked third in the region; the women were ranked fourth when their bid went in. (Ex. 23.) Members of the community were asking why the men were not hosting: on March 6, 2022, a fan wrote to the President's office that it was "absolutely unbelievable" that the No. 1 seed was not hosting, and on March 8 a reporter asked Milo the same question. (Exs. 45, 22, 23.) Track Coach Torrey Olson, Women's Basketball Coach Renee Jimenez, Athletic Admissions Director David Nathanson and the men's players, Blake Seits and Lyle Sutton, all understood that Milo did not bid for the men because she favored the women's program, and Milo did not like Foster or his team and did not want to support them. (Olson Decl. ¶ 7; Jimenez Decl. ¶ 9; Ex. 13 (Nathanson) 65:23-66:8; Sutton Decl. ¶ 7; Seits Decl. ¶ 8.) In December 2022, CSUSM adopted a written NCAA bid process that makes the Head Coach part of the bid committee. (Ex. 35.)

**C. The men's team's protest and Plaintiffs' complaints**

Before the March 10, 2022 rally, Foster called Vice President Viridiana Diaz twice, outside the athletics chain of command. In the first

call, Foster was "upset and very emotional" that no bid had been put in and told her there was "favoring happening with the women's basketball team" and that it was "unjust." In the second call, Foster told Diaz the players were not happy about the bid and did not want to participate in the rally, and asked, "What do I do? Like am I supposed to make them?" Diaz answered, "No, you can't make students go to a pep rally." Foster also asked Snedden and Milo to excuse the team or hold the rally for the women's team only; Milo's directive was "They need to be at the pep rally." Diaz asked Foster to try to explain to the men the difference between the bid and the celebration of being in the championship, and Foster conveyed the message. (Ex. 10 (Diaz) 21:8-23:14, 37:9-38:15; Ex. 33; Ex. 1 (Foster) 217:18-220:14, 224:18-225:8; Ex. 6 (Snedden) 76:3-80:5; Ex. 3 (Milo I) 97:9-98:5.)

The players, led by Lyle Sutton, Blake Seits and Jayce McCain, decided not to attend the rally. They "believed the administration had chosen the women's team over [them] and had not supported [the men's] team," and "[they] did not want to be used for a celebration by the people who had done that." Their "absence was a protest of that decision." When they told Foster and Ellis, the coaches said they supported the decision. Women's Basketball Coach Renee Jimenez, the women's team, Milo, Snedden, Leonard, Diaz and President Neufeldt all understood why they didn't go. Milo testified that Foster told her by text beforehand that his team "was very upset," did not "want to be a part of the pep rally," and "might show up in hoodies and sunglasses," and she testified, "They knew men's basketball didn't show up for the pep rally"; Leonard testified students called it "boycotting." (Ex. 1 (Foster) 224:18-227:24; Ex. 2 (Ellis) 206:14-208:24, 211:8-17; Ex. 3 (Milo I) 97:9-25; Ex. 4 (Milo II) 129:10-14; Sutton Decl. ¶¶ 5-6; Seits Decl. ¶¶ 6-7.) Milo already knew that the team was not going to show and started to preemptively retaliate. On March 9, 2022, Milo reported to VP Viridiana

Diaz that Foster "continues to ignore and decline my meeting requests" and that communication with the men's coaching staff "continues to be very strained and concerning." (Ex. 24.)

**D. The March 10, 2022 confrontation**

On March 10, 2022, at the rally, Milo, Snedden and Leonard "beelined" for the two coaches. Milo told Foster "You're not going anywhere"; Snedden screamed "Where's the players?" and told Ellis "We're not letting this bus leave until you get the players up here"; Leonard got "chest to chest" with Foster and yelled "That's a dick move" repeatedly, then got inches from Ellis's face and yelled "That's a fucking dick move." (Ex. 1 (Foster) 149:25-152:5, 228:1-23; Ex. 2 (Ellis) 96:18-20, 168:23-169:18, 212:14-213:16, 228:17-229:12; Ex. 3 (Milo I) 103:9-13.) Leonard admits the phrase and admits she has never called a woman at work a "dick." (Ex. 11 (Leonard) 63:5-16, 112:23-113:4.) Foster found the confrontation "pretty traumatic"; Ellis found it "pretty threatening." Leonard described the department afterward as "fractured"; Milo said people were "walking on eggshells." (Ex. 1 (Foster) 151:8-152:5; Ex. 2 (Ellis) 168:23-169:18; Ex. 11 (Leonard) 97:9-14; Ex. 4 (Milo II) 129:6-15.)

On March 10, 2022, Ellis emailed HR a hostile work environment complaint "as soon as [he] got on the bus," and Foster's complaint of sex discrimination went to the Title IX office through Diaz. (Ex. 2 (Ellis) 99:4-6; Ex. 10 (Diaz) 21:8-25, 31:19-25, 45:9-47:19; Ex. 34; Blanshan Decl. ¶ 4; Ex. 1 (Foster) 137:14-139:9.) Ten days later, Ellis put his complaint in writing to the Title IX Coordinator: "in fourteen years of coaching this is the most toxic work environment I have ever been in," he had been "verbally attacked and threatened by Jennifer Milo and Andrea Leonard," and he asked, "why am I scared each day that I could lose my job?" (Ex. 48.) The players complained too. Five or six of them, led by Seits, Sutton and

McCain, met with Diaz and told her that Milo "attends the games for the women's basketball team but she doesn't stay for the men's basketball team," that she "celebrates them, but doesn't celebrate our wins," and that their coaches were being mistreated. Diaz said she would "look into it." When their concerns went nowhere, they met with President Neufeldt and reported the same preferential treatment. She said she would look into it, but the players never heard from her again, and no investigator ever contacted Seits or Sutton. (Ex. 10 (Diaz) 29:9-32:12; Seits Decl. ¶¶ 8-9; Sutton Decl. ¶ 7.) Although Foster and Ellis formally complained on March 10, 2022, the outside investigator acknowledged "certain delays in starting this investigation," and its "formal investigation did not start until" August 29, 2022, five and a half months later and the same day Foster filed a government tort claim. (Milo Decl. ¶ 37 and Ex. F; Exs. 27, 31.)

**E. Leonard's campaign against Plaintiffs after the protest**

On March 30, 2022, Leonard told strength coach Paniagua that Foster and Ellis "should have been and should be fired for their involvement in the [boycott of] the NCAA tournament send-off," were "liars" trying to "manipulate people," and were "a negative influence and cancer in the athletic department." Paniagua memorialized this in an April 1, 2022 email. (Paniagua Decl. ¶¶ 6-8 and Ex. 2; Ex. 11 (Leonard) 72:11-79:11; Ex. 21; Ex. 6 (Snedden) 84:3-86:11.) Leonard told players not to associate with the men's players as "bad influences," told others Plaintiffs should be fired and were a "cancer," and said "If I ever get a chance to hurt him getting a job" and that she would "make sure [he didn't] work in this business." Snedden heard these statements and reported them to Milo in writing in April 2022; neither acted. (Ex. 1 (Foster) 152:15-153:15, 160:3-161:6, 308:4-8; Ex. 2 (Ellis) 150:11-151:19; Ex. 6 (Snedden) 82:1-18, 83:5-13 (as corrected by errata, Ex. 7, at 83:9), 85:5-86:24, 102:19-105:5; Ex. 19; Ex. 20; Ex. 4 (Milo

II) 121:18-123:13; Jimenez Decl. ¶ 12.)

Leonard told Jimenez that "If we don't stick together, we're all going to get fired," and told her the men's coaches were "going to try to get us fired" and "Don't trust them." (Ex. 11 (Leonard) 85:22-87:3, 113:5-12; Ex. 1 (Foster) 250:3-10.) On April 1, 2022, Foster reported in writing to the Title IX Coordinator that Leonard "has been slandering my name to coaches and other staff members"; no one responded, and Leonard shared Foster's office area until he left. Leonard lost the SWA position only in February 2024, after both Plaintiffs had resigned. (Ex. 49; Ex. 1 (Foster) 160:3-17, 255:19-256:18; Ex. 11 (Leonard) 30:2-24; Ex. 10 (Diaz) 17:14-18.)

**F. Retaliation after the complaints**

On March 15, 2022, five days after the rally, Milo sent Faculty Affairs and the Title IX Coordinator, copying Diaz, draft letters of reprimand for both Plaintiffs dated March 16, 2022. The Foster draft faulted him because "[i]nstead of communicating with me or your direct supervisor, Todd Snedden, you chose to communicate with Vice President of Student Affairs, Viridiana Diaz," and because "you reached out to VP Diaz to express your concerns/complaints to her." The Ellis draft called it "inaccurate and dishonest" for him to say the men would host if they won the CCAA tournament. Each reprimand accused each coach of immoral conduct, unprofessional conduct, dishonesty, and incompetence and warned that further concerns would bring "appropriate discipline," up to and including termination.[1] (Ex. 25.) The next month Ellis asked Snedden "if he was going to get fired." (Ex. 20.)

After the complaints, Snedden gave Foster a 3.6, his lowest rating ever, for the most successful season in program history. Milo had rated

[1] Although Plaintiffs never received these reprimands, they are being produced to demonstrate Milo's retaliatory intent.

Foster a 5 ("outstanding") in 2017, and Snedden had scored him higher in losing seasons. (Ex. 1 (Foster) 170:1-171:24, 172:7-177:19; Snedden Decl. Ex. F; Ex. 6 (Snedden) 140:14-142:20, 153:10-154:8; Ex. 3 (Milo I) 31:18-32:16.) The year before, on May 25, 2021, Snedden had signed Foster's 2020-21 evaluation with an overall ranking of 5, "Outstanding." (Ex. 38.) Snedden's first draft of the 2021-22 evaluation, which he sent to Milo for review on May 25, 2022, was lower still: an overall 3.4, with ratings of 2 ("Marginal") for commitment to the mission of Athletics, for conducting himself and the program professionally, and for supporting community events, and a comment that Foster and Ellis "supported the team choosing not to attend the send-off rally," a decision that "went against direction by the Director of Athletics." (Ex. 43.)

Snedden's written comments penalized the protest: Foster "does not always support/agree with department values, policies or decisions," "did not articulate the benefit of the send-off rally to his team or follow the directive provided by the Director of Athletics." Asked whether the "lesson learned" was that the coaches should have made the players attend, Snedden answered, "That was the expectation, yes." (Snedden Decl. Ex. F (CSU 009232-40); Ex. 6 (Snedden) 139:22-140:2, 143:9-23, 148:17-149:21.) Foster rated Ellis 4.3 to 4.4; Snedden directed Foster to lower it to 4.1 and added that Ellis "did not articulate the importance of following the directive given by the director of athletics" and "supported his student-athletes decision not to attend the send-off." (Snedden Decl. Ex. G; Ex. 6 (Snedden) 145:2-146:16, 148:1-11; Ex. 2 (Ellis) 90:11-96:14, 221:7-222:6; Ex. 1 (Foster) 174:14-18, 176:7-12.)

Coaches hold one-year contracts renewed on evaluations; poor evaluations "add up" to grounds for non-renewal. After the championship, Milo told the coaches to "carefully consider the renewal of your contracts,"

and in the final staff meeting said she would "carefully consider your evaluations ... and determine if we're going to get contracts." Ellis reported the comment to the outside investigator on July 8, 2022. (Ex. 1 (Foster) 46:2-47:15, 174:19-175:3; Ex. 2 (Ellis) 51:17-52:22, 56:19-57:11, 219:13-20; Ex. 50; Ex. 4 (Milo II) 127:5-129:3 (see errata, Ex. 5, at 127:15).)

After the complaint, Snedden's approach changed to "pretty hard nose"; "everything was a 'no.'" He told Ellis he was "a hundred percent required" to attend a retreat during approved vacation for a former player's wedding and relented only after Ellis involved the union. Requests formerly met with "Let's see what we can do" became a "hard 'No,'" and Plaintiffs were told to expect "less resources" after the championship season. (Ex. 2 (Ellis) 97:23-98:12, 137:4-20, 138:7-141:10, 229:13-230:17; Ex. 6 (Snedden) 91:14-92:13, 149:22-151:3.) Snedden also yelled at Foster at meetings. (Ex. 1 (Foster) 132:5-22, 134:19-135:19.) After Plaintiffs' complaints, CSUSM required Foster's fundraised scholarship money to be in hand before a recruit could be signed, where previously he could pledge and collect by November. Nathanson had no recollection of the rule being applied to any other program. On May 31, 2022, Ben Baker chose CSUSM over Seattle Pacific, and Foster asked to get the offer out that day, but the money was not yet in the account, and Foster lost him; Snedden admits "he lost Ben Baker. We know that." (Ex. 1 (Foster) 196:22-197:12, 269:18-271:10; Ex. 13 (Nathanson) 61:15-63:7, 91:1-92:7; Ex. 6 (Snedden) 61:8-63:10, 65:13-14; Ex. 4 (Milo II) 207:6-208:8; Ex. 47.)

Athletics Admissions Director David Nathanson had pointed out to Snedden that the Transfer Committee was requiring a men's soccer recruit, Pedro Moura, to enroll in an A3 course while Mikaela Harris, "Renee's recent transfer that was approved, also does not have an A3," and that Leonard had approved Harris. (Ex. 42.) On July 29, 2022, Foster asked

Snedden whether "[w]omen's basketball got a girl through without an A3" and wrote that "there has been a lot of unfair bias treatment and retaliation that I have received." On August 1 Snedden blind-copied Milo on his reply, and minutes later Milo told Diaz that Foster was "very unprofessional," had "questioned him on our standards for admission" and had "claimed bias and retaliation." Ellis wrote Snedden that Tanaka was "admissible with an exception" and that "this, like the bid is calculated." (Ex. 26.) Nathanson testified the hurdles on fundraising, scholarships and transfers left Foster "thwarted, handcuffed" and that the difficulty "increased after the investigation began." (Ex. 13 (Nathanson) 17:6-21, 52:2-53:8.)

In August 2022, after the complaints, recruit Tanaka met admission requirements and admissions "would have moved forward," but Snedden called Milo, who said "No, we're not going in that direction," and Snedden had Nathanson tell the coaches Tanaka could not get in. (Ex. 13 (Nathanson) 31:8-35:8, 87:16-88:9; Ex. 6 (Snedden) 65:22-67:5, 111:9-112:21, 187:10-188:22; Ex. 26; Ex. 2 (Ellis) 265:3-271:11; Ex. 1 (Foster) 279:21-282:20.) Admissions had told Nathanson in writing that "we can make an exception for him to be deficient in 1 semester of VPA and not require a Memo," and Foster sent that message to the outside investigators on August 10, 2022. (Ex. 41.)

On August 1, 2022, Foster wrote to Diaz asking for a meeting because "the PII investigation is moving a lot slower than I was hoping." He told her his "biggest fear of coming out with the treatment I have received from Jenn was the administration would make things hard when it came to recruiting," that he had examples he believed were retaliation, and that they "cost me two players that were committed to San Marcos." Diaz answered the next day that she "must refer this request" to the Title IX Coordinator and would then "confirm next steps and the feasibility around a meeting." (Ex. 40.)

On November 30, 2022, Ellis documented that the whole team had been ordered to test on November 28, that asymptomatic players were treated as positive, that his request to let them retest with an antigen test "was not received," and that one player "was denied the opportunity to test out with an antigen test." He wrote: "I feel like this is retaliation against our program for the current situation we are in. This is their way of getting back at us for the complaint that was filed." (Ex. 44.)

**G. Foster's constructive discharge**

After the complaints, Foster was isolated. He testified: "nobody would even talk to me because Jennifer had all those cameras and they were scared to talk to me"; Jimenez called him from twenty feet away rather than be seen; "You're just on an island by yourself." Jimenez confirms she and Foster spoke only by phone because Milo watched. (Ex. 1 (Foster) 155:3-16, 196:2-12, 269:18-272:13; Jimenez Decl. ¶ 13; Ex. 2 (Ellis) 300:19-301:14.) Milo's authority as the Athletic Director over Plaintiffs did not change after the complaints; she remained Athletic Director with access to the reports and witnesses for eighteen months, had Snedden and Stock compile responses to the allegations, and "was in the know." Witnesses were "terrified." (Ex. 3 (Milo I) 12:6-13:3, 15:10-16:2; Ex. 4 (Milo II) 130:22-131:11, 160:21-25; Ex. 1 (Foster) 292:6-293:11; Ex. 13 (Nathanson) 13:6-24.)

In January 2023, at a game at Cal State San Bernardino, that school's interim athletic director, a friend of Milo and Leonard, stood behind Foster's bench texting and then filed a false report about his conduct. Shah prepared a documentation memo; PII never investigated the complaint. Snedden learned of it "from Jen" while she claimed to be recused. (Ex. 1 (Foster) 196:13-17, 262:13-268:9; Ex. 8 (Shah) 67:3-68:14, 129:6-132:2; Ex. 36; Ex. 6 (Snedden) 176:5-6.) The CSUSB report went straight to Milo. Deputy Athletic Director Chelsea Herman emailed Milo on January 6, 2023. Fifteen

minutes later, Milo, who was then under investigation on Foster's complaint, forwarded it to Diaz and Shah, added that she had "witnessed him throw a clipboard and kick a water bottle," and told Shah to "advise how these matters will be handled with BJ." Foster wrote at the time that "[t]hese distractions and these people out to get you, is weighing on me and affecting my job," and that the CSU had "not done anything from the investigation standpoint." (Exs. 28, 29.)

On March 14, 2023, Milo wrote the Title IX Coordinator, Human Resources and Diaz that Foster was going to commence litigation and that she saw "a discriminatory pattern of behavior by BJ Foster ... based on gender and sexual orientation," that his claims "coincide with 'favoritism' or 'bias' based on gender and sexual orientation of" five women (Ewing, Jimenez, Leonard, Drumm and Herman), and that "[a]ll BJ Foster's claims are false, inaccurate, discriminatory, and retaliatory in nature." (Ex. 30.) Milo was continuing to report anything she could despite her testimony that she was no longer involved.

When Foster asked Shah, his new supervisor, where things were going, Shah said, "Nothing's going to change. It's going to be this or even harder as it goes." Shah testified going over Milo's head "would be difficult." (Ex. 1 (Foster) 272:18-273:1; Ex. 8 (Shah) 70:21-71:14, 114:6-24.) Foster testified that by 2022-23 "the first thing I would do when I'd pull up on the campus is look and see if her car was in that first spot ... It would take your breath away"; "it just felt like they were numbering my days"; "if I didn't leave now, that they would get me. And they would end my career just like Andrea said"; "I couldn't do another year with it happening." (Ex. 1 (Foster) 197:13-23, 273:2-16, 305:16-306:22.) Foster told Nathanson he resigned because of "these various hurdles, as it felt like he had no other option ... he couldn't remain as the head coach at CSUSM and so was forced

to look elsewhere." He would return if the personnel responsible were gone. (Ex. 13 (Nathanson) 19:6-16; Ex. 1 (Foster) 304:10-305:12.)

**H. The denial of the interim head coaching position and the outside search**

CSUSM's practice was to elevate the assistant of a successful program: Foster was made interim when Saia left in June 2016; Crystal Harris was elevated in women's basketball; A.J. Robinson succeeded Ewing in softball in the off-season; a track assistant was named interim after Ellis was denied. Saia and Jimenez confirm this is the CSU custom. (Ex. 1 (Foster) 34:23-35:12; Ex. 8 (Shah) 93:5-94:25; Ex. 13 (Nathanson) 71:6-72:18, 74:3-11; Ex. 10 (Diaz) 79:14-80:2, 95:4-14; Ex. 2 (Ellis) 124:13-126:1; Saia Decl. ¶ 7; Jimenez Decl. ¶¶ 4, 14.) Ellis was the "driver" of recruiting and "a big part" of the program's success; the team had the highest GPAs in program history and back-to-back NCAA appearances. Shah rated Ellis very highly in student experience in his last evaluation. Nathanson, Saia, Jimenez and Williamson were surprised he was not elevated. (Ex. 13 (Nathanson) 42:2-18, 69:5-71:19; Ex. 8 (Shah) 56:19-25, 83:18-84:20; Ex. 2 (Ellis) 121:25-122:17, 194:19-22; Saia Decl. ¶ 8; Jimenez Decl. ¶ 14; Williamson Decl. ¶¶ 10-11.) On April 13, 2023, the players wrote President Neufeldt and Diaz asking that Ellis be named head coach. They wrote that "[t]here's only one obvious choice," that he was "the best candidate," and that he "was instrumental in transforming the program." They warned that during a national search "the entire team will be in the transfer portal," and that it "would truly be a shame if we rely solely on the athletic department's decision, given they have not shown the best interest of the team in the past." Diaz replied with a one-line thank you. (Ex. 32; Sutton Decl. ¶ 8; Seits Decl. ¶ 10.)

On April 10 and 11, 2023, Ellis told Shah he found it hard to believe

he would be passed over had he not filed a complaint. Shah called this a "red flag" because Ellis "was positioning himself," said he "could see the angle of where things were going," and chose "a neutral party, a third party ... to avoid, essentially, being where we are right now." Shah reported the remark to Diaz. (Ex. 8 (Shah) 95:25-97:4 (see errata, Ex. 9, at 96:17-25), 120:14-121:18; Shah Decl. ¶ 18; Ex. 2 (Ellis) 119:2-5, 389:15-391:4.) A national search firm would not have been hired absent Ellis's complaint. On April 13, 2023, Milo texted Diaz that a search firm would be "very beneficial given some of our current scenarios." On April 18, Diaz texted Milo: "Please confirm if you'll be appointing an interim basketball coach. If not, I need to document the reason behind the decision." The Renaissance contract named Milo as the person to whom "the contractor shall report." Diaz told the outside investigators that she and Shah researched prior appointments "and put it all together in advance because we knew Adam would demand to be appointed and we wanted to document it," and that "it is clear what Milo wanted, and that Milo wanted a national search." (Ex. 4 (Milo II) 151:11-18, 156:2-23, 157:7-22; Ex. 8 (Shah) 75:5-25; Ex. 14 (Gordon) 40:13-21, 43:18-22; Ex. 10 (Diaz) 79:3-13, 80:3-81:1; Ex. 8 (Shah) 72:17-73:24 (see errata, Ex. 9, at 73:5, 73:13); Shah Decl. ¶ 11; Ex. 10 (Diaz) 92:5-15, 93:14-95:3; Ex. 46; Shah Decl. ¶¶ 15-16 and Ex. A.)

Renaissance was the first search firm ever used for a CSUSM coaching hire. Shah did no due diligence beyond its website, which emphasized diversity. (Ex. 4 (Milo II) 150:13-151:3, 203:3-204:6; Ex. 8 (Shah) 75:5-76:17 (see errata, Ex. 9, at 76:7), 97:17-98:5; Ex. 13 (Nathanson) 73:5-15; Ex. 1 (Foster) 298:14-302:25.) During the search, Adam Gordon from Renaissance heard from a coach in the league and "people around the program" of a "public shouting match" between the head coach and the Athletic Director, which he testified "doesn't bode well for the

student-athlete experience" and "factored in" to his scoring; he gave Ellis the only score of 1 among 107 applicants in that category. Adam Gordon told Ellis he must "differentiate" himself from Foster, and testified "the support was split" between the two internal candidates, although Shah and Stock supposedly gave him "no information on either internal candidate." (Ex. 14 (Gordon) 57:1-19, 66:10-14, 68:9-69:1, 70:24-71:4, 128:9-12, 129:1-9, 131:9-13; Gordon Decl. ¶ 27; Ex. 2 (Ellis) 128:8-131:18, 327:9-337:20, 378:2-381:21; Ex. 17.)

CSUSM, not Renaissance, set every scoring category, including a requirement of NCAA experience under which CSUSM "didn't really want to even consider" junior college head coaching, which is where four of Ellis's six years of head coaching experience lay. Gordon pushed back because the rule eliminated "some of Mr. Ellis' experience"; "Cal State San Marcos held firm." Under CSUSM's criteria, Ellis's head coaching score "probably should have been zero"; two finalists received CSU-experience points for time in the UC system. Ellis received a 1 in academics based on a thirty-minute phone screen; Gordon "didn't need to know the GPAs." (Ex. 14 (Gordon) 32:5-33:14, 34:7-35:5, 49:1-8, 79:8-80:14, 81:1-83:9, 86:21-87:9, 90:15-93:12; Ex. 2 (Ellis) 339:5-341:16, 347:8-348:10, 353:17-354:24; Williamson Decl. ¶ 11.) No one at CSUSM compared Ellis's qualifications to the finalists; Shah testified he had not seen the finalists' resumes (an answer he changed by errata to say he was given each resume on the day of the finalist's campus interview) and "would not know" how Ellis compared, and Shah and Stock were "surprised" Ellis was not in the top ten. Gordon told Ellis he had done well "but that CSU wanted to go into a different direction." (Ex. 8 (Shah) 77:12-78:23, 80:6-16, 99:23-101:19 (see errata, Ex. 9, at 101:9); Ex. 14 (Gordon) 93:13-23, 99:17-25, 132:13-19; Ex. 10 (Diaz) 82:8-17, 87:22-88:14; Ex. 2 (Ellis) 230:18-232:10, 393:5-10.)

Ellis testified that after the search was announced he was "completely isolated," "put in a back corner in a room," an assistant with no head coach to assist, treated "like [he] was a disease." Booker, the incoming head coach, told Ellis "he wanted to bring his own guy" and "encouraged [him] to find another place." Ellis resigned June 12, 2023 for an assistant job at Idaho at $15,000 to $20,000 less, losing family health coverage and pension vesting. (Ex. 2 (Ellis) 21:17-23:4, 60:5-64:9, 231:3-15, 232:11-233:19, 238:15-20, 240:4-241:14, 258:16-22, 261:13-262:1.) Ellis wrote in his resignation that the last year had been taxing on him and his family with the deadlines of the investigation being pushed back with very little communication. Ellis wrote that he had communicated to the Title IX office that the refusal to promote him to Interim Head Coach and the refusal of the opportunity to interview were either retaliation based on the investigation or based on the need for more diversity in the athletic department. (Ex. 51.)

## III. LEGAL STANDARD

Summary judgment is proper only if no reasonable jury could find for the non-moving party, with the evidence viewed and all inferences drawn in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Because employment discrimination and retaliation cases turn on motive, "many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper." *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 286 (2009). The Legislature has declared that "[h]arassment cases are rarely appropriate for disposition on summary judgment." Cal. Gov't Code § 12923(e). Where a plaintiff offers direct evidence of unlawful motive, the *McDonnell Douglas* framework does not apply, and "very little" such evidence is needed. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998); *DeJung v. Superior Court*, 169 Cal. App. 4th 533, 550 (2008).

## IV. ARGUMENT

### A. Defendants' Motion Disregards Plaintiffs' Theory of the Case and the California Case Law Requiring Evaluation of the Totality of the Circumstances

Defendants' motion seeks to isolate each act and ask whether, standing alone, it constitutes an adverse employment action. The California Supreme Court rejected that approach in *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028 (2005). There is "no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries," and a plaintiff may challenge "the totality of the circumstances" rather than each act "in isolation." *Id.* at 1055-56. An adverse action is one that "materially affects the terms, conditions, or privileges of employment," a phrase that "must be interpreted liberally" to include conduct "reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." *Id.* at 1053-54 & n.13. Unwarranted negative evaluations, solicited complaints, and refusals of requests that were formerly granted, considered together, were sufficient in Yanowitz. *Id.* at 1060-61. The same is true under Section 1983, where the question is whether the conduct is "reasonably likely to deter employees from engaging in protected activity." *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003).

Defendants also treat Milo's, Snedden's and Leonard's declared good intentions as "undisputed facts." A decision-maker's statement of her or his own motive is not undisputed when the record contains contrary evidence; it is the disputed fact. *Reid v. Google, Inc.*, 50 Cal. 4th 512, 541 (2010) (court must consider "the totality of the evidence"). And the credibility of an explanation is for the jury where the employer's reasons have shifted, where the stated reason appears nowhere in the contemporaneous record, or where

the employer departed from its own practice. *Hersant v. Department of Social Services*, 57 Cal. App. 4th 997, 1005 (1997); *Chuang v. University of California Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000). Defendants' motion also proceeds as if the only witnesses were the parties. It does not address the sworn declarations of the former CSUSM coaches and staff who describe the favoritism, the hostility and the retaliation from the inside. See Jimenez Decl.; Williamson Decl.; Paniagua Decl.; Olson Decl.; Saia Decl.; Sutton Decl.; Seits Decl. Todd Snedden's Declaration is unsigned and should not be considered. See Objections.

**B. Triable Issues Exist on Plaintiffs' FEHA Retaliation Claim (Third Cause of Action)**

To prevail on a retaliation claim, Plaintiffs must show protected activity, an adverse action, and a causal link. *Yanowitz,* 36 Cal. 4th at 1042. Causation may be shown by direct evidence or inferred from the employer's knowledge of the protected activity and the timing and pattern of what followed. *Morgan v. Regents of University of California*, 88 Cal. App. 4th 52, 69-70 (2000); *Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590, 615 (1989). Defendants do not contest protected activity.

**1. The totality of the circumstances demonstrates that Defendants' retaliatory actions affected the terms and conditions of Plaintiffs' employment**

Viewed as a whole, the record shows a campaign of retaliation. Plaintiffs encountered a public confrontation by three administrators. Milo sent VP Diaz reprimands accusing Plaintiffs of immoral conduct. Leonard told people throughout the campus that Plaintiffs should be fired, defaming them. The evaluations lowered both coaches' scores and criticized them in writing for the protest. Milo threatened to "carefully consider" their contracts. Snedden threatened revocation of Ellis's approved vacation,

which prompted union intervention. Milo, who claims she recused herself, refused a qualified recruit and insisted on a new cash-in-hand rule that fell only on the men's program and cost a recruit. Plaintiffs received a "hard 'No'" from Snedden and Shah to requests formerly granted. Plaintiffs were ostracized by members of the Department who feared the Athletic Director. For Ellis, the interim appointment was denied and the search was outsourced. Both were then constructively discharged. Defendants' responses to these arguments do not survive Yanowitz. The evaluations were lower than either coach had ever received, for the best season in school history, and they put in each coach's personnel file a written finding that they had not followed the Athletic Director's "directive," in a system where one-year contracts are renewed on evaluations. *Yanowitz*, 36 Cal. 4th at 1060. The denial of the interim appointment is, as Defendants concede, an adverse action and it was followed by a search in which the firm CSUSM chose applied CSUSM's criteria, marked Ellis down for the very protest that prompted the complaints, and told him CSUSM "wanted to go into a different direction." The cash-in-hand rule and the Tanaka refusal went to the core of a coach's job, recruiting, which "has a direct relation to winning games, which is how coaches stay employed." (Ex. 1 (Foster) 145:24-146:16.) Milo's continued reports that Foster was unprofessional and her insistence that he be reprimanded for the CSUSB game demonstrated that she was not going to let up. Defendants' repeated refrain that coaches are not paid by wins (UMF 15) misses the point: Yanowitz asks whether the conduct affected job performance or opportunity for advancement.

**2. Causation: direct evidence and an unbroken chain of inference**

For Ellis, there is direct evidence. Shah, the decision-maker, testified that Ellis's statement that he would not be passed over but for his complaint

was a "red flag," that Shah "could see the angle of where things were going," and that he therefore chose an outside firm "to avoid, essentially, being where we are right now." (Ex. 8 (Shah) 95:25-97:4, 120:14-121:18; Shah Decl. ¶ 18.) Milo's declaration confirms that the search firm was proposed because Ellis "was trying to position himself for a legal claim." (Milo Decl. ¶ 50.) Milo testified the firm was retained "so that there is no conflict of interest or retaliation claim" and that she does not know whether a firm would have been hired absent Ellis's complaint. (Ex. 4 (Milo II) 151:11-18, 156:2-23, 157:7-22.) An employer that departs from its practice and restructures a hiring process because an employee has invoked his protected rights has retaliated; the fact that it did so to insulate itself from the complaint does not make the motive lawful. *Yanowitz*, 36 Cal. 4th at 1042-43. This is the rare case in which the decision-maker has said the protected activity was the reason. *DeJung*, 169 Cal. App. 4th at 550-51.

The circumstantial evidence is equally strong. Timing: the national search was announced the day Foster resigned and recommended Ellis; the search-firm text followed Ellis's complaint by two days; Diaz's "I need to document the reason" text followed five days later; Shah's "analysis" of interim practice was written a month after the decision. (See Ex. 10 (Diaz) 73:6-16, 76:7-78:17; Ex. 8 (Shah) 65:6-67:2, 73:25-75:4; Shah Decl. ¶¶ 15-16 and Ex. A.) CSUSM deviated from previous practice. No coaching search in CSUSM's history had used an outside firm, and every comparable vacancy had been filled by elevating the assistant. Chuang, 225 F.3d at 1127. VP Diaz told investigators she and Morad Shah had "put it all together in advance because we knew Adam would demand to be appointed and we wanted to document it." (Ex. 10 (Diaz) 93:14-95:3; Ex. 46.) Athletic Director Jennifer Milo, the subject of the pending investigation, recommended the search firm, supplied the referral, and told Shah no interim

would be "typical," while Diaz concluded "it is clear what Milo wanted." (Ex. 4 (Milo II) 151:11-18, 156:2-20, 157:7-12; Ex. 10 (Diaz) 79:3-13, 80:3-81:1, 93:14-95:3; Ex. 8 (Shah) 72:17-73:24, 75:5-25.) A reasonable jury could find that Milo's retaliatory animus infected the decision through Shah and Diaz. *Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 108-16 (2004); *Staub v. Proctor Hospital*, 562 U.S. 411, 419-22 (2011).

Snedden's claim that he had "not even been alerted" to the complaints when he wrote the evaluations (Snedden Decl. ¶ 9) is contradicted by his own notes to Milo recording the coaches' complaints in April 2022, by Ellis asking him that month whether he was going to be fired, by Milo's declaration that she delegated the men's program to him because of the complaint, and by his presence at the rally that was the subject of Ellis's March 11 complaint. (Ex. 6 (Snedden) 49:8-25, 83:5-13, 87:18-92:13, 111:9-112:17; Ex. 19; Ex. 20; Ex. 26; Ex. 4 (Milo II) 119:15-123:13, 136:3-142:23; Milo Decl. ¶ 38.) The evaluations do not merely coincide with the protected activity; they punish it on their face. Leonard's statements that Plaintiffs should be fired "for their involvement in the [boycott]" are direct evidence of animus toward the protest, and Snedden reported them to Milo, who did nothing. The Tanaka refusal came days after Foster's complaint of retaliation and was made by Milo personally. Foster testified that the cash-in-hand rule arrived "the year after I blew the whistle" and was never applied to any other program. The proof of Leonard's statements does not depend on Plaintiffs: Paniagua recorded them in an email two days later, and Jimenez heard at the time that Leonard was telling team members Foster should be fired. (Paniagua Decl. ¶¶ 6-8 and Ex. 2; Jimenez Decl. ¶ 12.)

**3. Defendants' "legitimate reasons" are disputed on this record**

Each explanation Defendants offer is contradicted by their own

witnesses. Snedden's declaration explains Ellis's reduced score by purchasing, travel and on-court coaching; the evaluation he actually wrote cites the rally. Shah's and Diaz's "timing" explanation for the interim decision is contradicted by Foster's own June 2016 interim appointment, by the off-season appointments in softball and women's basketball, and by the track interim appointed afterward. Milo's statement that the cash-in-hand rule "applied equally to all sports" is contradicted by Admissions Director David Nathanson, who administered it. (Ex. 13 (Nathanson) 61:15-63:7, 91:1-92:7.) Snedden's declaration that Tanaka was not approved by admissions is contradicted by his deposition testimony that admissions was willing, and Milo said no. (Ex. 6 (Snedden) 65:22-67:5, 111:9-112:21.) A jury that hears the decision-makers contradict their own declarations may disbelieve the declarations. *Hersant*, 57 Cal. App. 4th at 1005; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-48 (2000) (disbelief of the employer's explanation, together with the prima facie case, permits a finding of unlawful motive). Defendants' claim that CSUSM had no practice of elevating assistants rests on a citation to "Shah Decl. ¶ ##," which does not exist (UMF 47-48; see Fed. R. Civ. P. 56(c)(1)), and it is contradicted by Saia and Jimenez, who swear that elevating a successful assistant is the "custom and practice" in the CSU system. (Saia Decl. ¶ 7; Jimenez Decl. ¶¶ 4, 14.)

### C. Triable issues exist on the sex discrimination claim (First Cause of Action)

Defendants argue the bid decision was not an adverse action and that Milo had legitimate reasons. Both points are for the jury. The bid decision materially affected the privileges of Plaintiffs' employment and their opportunity for advancement. Hosting a regional is the home-court reward for a top seed; Snedden testified it is "an opportunity that you don't get very

often," "would have been helpful for their trajectory," and "would have validated ... what they've worked for." (Ex. 6 (Snedden) 135:6-137:13.) The decision cost the team a first-round home game it lost on the road, and cost its coaches the professional standing that comes with hosting. The bid is also the clearest example of a broader pattern of lesser support, in resources, admissions, COVID protocols, travel and scholarships, that a jury may consider as a whole. *Id.* at 1055-56.

The FEHA protects men from sex discrimination on the same terms as women. Cal. Gov't Code § 12940(a). Disparate treatment "is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their ... sex," and discriminatory motive "can in some situations be inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). The evidence that sex motivated Milo is substantial. Milo said she "would sure love to hire a woman" for the men's job. She stayed for women's games and left before men's. She yelled at men's coaches only. The women's basketball coach told Plaintiffs she received favorable treatment "because she was a female." Olson, who coached both men and women, personally observed that Milo "often made decisions prioritizing women." (Olson Decl. ¶ 4.) Male recruits were held to standards female recruits were not; the women's player who was missing the same course as the men's recruits "received the benefit of the mistake." (Ex. 6 (Snedden) 108:14-110:16, 165:24-166:12.) Milo personally denied male players COVID retests while softball players retested. The men rode in vans; the women rode buses. David Nathanson, the Athletic Admissions Director, told investigators Milo "absolutely" favored the women's teams. This "me too" evidence of how Milo treated other male coaches is admissible and probative of motive. *Johnson v. United Cerebral Palsy/Spastic Children's*

*Foundation*, 173 Cal. App. 4th 740, 759-67 (2009). Defendants' Title IX argument answers none of this; Title IX required proportional scholarship aid, not vans for the men, not denial of retests, not unequal admission standards, and not the refusal to submit a bid. CSUSM's own former coaches confirm that this is a jury question. Defendants' expenditure figures do not answer this evidence: the totals include the scholarship money Foster had to raise himself, and Plaintiffs do not base their claims on base salary. (Resp. UMF 29-32.)

Milo's reasons for the bid are a textbook pretext case. The facilities reason is contradicted by Shah, who says the question never came up and hosting both was feasible, by Shah's own January 2022 reservation of the arena for a men's regional, by CSUSM's prior hosting of both conference tournaments, and by Milo's admission that she could have bid for both. (Ex. 8 (Shah) 38:23-25, 122:4-124:9; Ex. 4 (Milo II) 188:18-189:2; Ex. 13 (Nathanson) 65:6-22.) The "I did not know the rule" reason asks the jury to believe that a ten-year Athletic Director who had submitted a women's bid two years earlier did not know a rule that the men's coaches, the women's coach, Leonard, and a Vice President new to athletics all understood. (Ex. 3 (Milo I) 84:1-20; Ex. 1 (Foster) 236:4-21, 236:25-237:19, 239:5-20; Ex. 10 (Diaz) 26:5-18.) The comparative-performance reason is wrong on the rankings that mattered. When the women's bid went in on February 21, 2022, the women were ranked fourth in their region and the men third in theirs. (Ex. 23.) Snedden testified the men's bid "was the right thing to do," that he tried through Shah to get Milo to change her mind, to no avail, and that he regrets not submitting it. Defendants are right that the FEHA does not condemn honest mistakes; whether this was an honest mistake, or a decision that reflected the favoritism Milo's own staff described, is what trials are for. *Reid*, 50 Cal. 4th at 541; *Nazir*, 178 Cal. App. 4th at 286. The

women's head coach, who spoke with Milo weekly about the bid, told CSUSM's investigators the real reason: Milo "did not like Foster and his team and did not want to support them." (Jimenez Decl. ¶ 9.)

**D. Triable issues exist on the hostile environment harassment claim (Seventh Cause of Action)**

A hostile environment plaintiff must show that he was subjected to unwelcome conduct, because of sex, that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *Fisher*, 214 Cal. App. 3d at 608. The Legislature has rejected the standards Defendants invoke. A single incident of harassing conduct is sufficient if it "unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." Cal. Gov't Code § 12923(b). The existence of a hostile environment depends on "the totality of the circumstances," and "a discriminatory remark, even if not made directly in the context of an employment decision or uttered by a nondecisionmaker, may be relevant, circumstantial evidence." *Id.* § 12923(c). The hostility directed at Plaintiffs at the pep rally and Leonard's defamatory statements that Plaintiffs should be fired obviously made it "more difficult to do the job." *Id.* § 12923(a). Supervisors are personally liable. *Id.* § 12940(j)(3). The CSU is strictly liable for harassment by its supervisors and for its failure to act on Leonard's conduct. *Id.* § 12940(j)(1); *State Department of Health Services v. Superior Court*, 31 Cal. 4th 1026, 1041-42 (2003).

Defendants' argument that "personnel management actions" cannot be harassment overreads *Reno v. Baird*. In *Roby v. McKesson Corp.*, 47 Cal. 4th 686 (2009), the Supreme Court held that official employment actions "can also have a secondary effect of communicating a hostile message," and that such actions are evidence of harassment "when the actions establish a

widespread pattern of bias." *Id.* at 708-09. Snedden's evaluations, which told both coaches in writing that they had failed to follow the Athletic Director's "directive" and had wrongly "supported" their players, communicated exactly that message. In *Miller v. Department of Corrections*, 36 Cal. 4th 446 (2005), the Court held that widespread favoritism toward one group may itself create a hostile environment for the disfavored group by sending the message that they are "viewed by management as ... less valued." *Id.* at 466-70. That is Plaintiffs' case: the favoritism toward the women's programs was so pervasive that the men's coaches had the women's coach make their requests.

The conduct is "because of" sex. Contrary to Defendants' arguments, harassment because of sex does not require sexual content or sex-specific words; it may be shown by "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998); *Lyle v. Warner Bros. Television Productions*, 38 Cal. 4th 264, 280 (2006). It is "the disparate treatment of an employee on the basis of sex ... that is the essence of a sexual harassment claim," *Lyle*, 38 Cal. 4th at 280, and the conduct "need not be motivated by sexual desire." Cal. Gov't Code § 12940(j)(4)(C). Milo yelled only at men's coaches, and only men's coaches cried; she praised the women's teams publicly and called the men's coaches a "cancer"; she said she would love to hire a woman for their job. Leonard's "dick move" is, by her own admission, a phrase she has never used toward a woman at work. (Ex. 11 (Leonard) 63:5-16, 112:23-113:4.) Snedden carried out Milo's directives against the men's program and, by his own account, treated the female player who was missing a course differently from the male recruits who were missing the same one. (Ex. 6 (Snedden) 108:14-110:16, 165:24-166:12.)

The conduct is severe or pervasive under the statutory standard. Over five years Milo yelled at Foster "a couple times a year," used profanity, called the men's coaches a "cancer" and "rogue," told them to "buy in or get out," and made passive-aggressive digs at them in every monthly staff meeting. (Ex. 1 (Foster) 122:18-123:11.) On March 10, 2022, three administrators berated the coaches in front of several hundred people, including the President, with Leonard chest to chest with Foster and inches from Ellis's face. Leonard told anyone who would listen that Plaintiffs were liars and a cancer who should be fired, told players to avoid them, and threatened Foster's career, while Milo and Snedden, who knew, did nothing. Under section 12923(b) the March 10 incident alone would suffice; the record shows far more. Defendants' observation that Milo yelled at Ellis to his face only once ignores that she ran the department through Snedden and Leonard and that harassment includes conduct the plaintiff learns of. *Beyda v. City of Los Angeles*, 65 Cal. App. 4th 511, 519-21 (1998). The third-party witnesses describe the same environment: "hostile and fear-based," "dictatorial and aggressive," male coaches "afraid for their jobs," and Foster and Ellis "blackballed." (Williamson Decl. ¶ 5; Paniagua Decl. ¶ 4; Jimenez Decl. ¶¶ 11, 13.)

### E. Triable issues exist on Ellis's race discrimination claim (Sixth Cause of Action)

The CSU is liable for the head coaching decision; it chose to outsource the search for a retaliatory reason, dictated every scoring category (including the rule that excluded Ellis's head coaching experience), named Milo as the person the firm reported to under the contract, and made the final selection through a committee that included Shah. (Ex. 14 (Gordon) 40:13-21, 43:18-22.) CSUSM's position that it acted through a search firm does not insulate it. Screening and ranking applicants is FEHA-regulated activity,

and a firm that carries it out on the employer's behalf does so as the employer's agent. Cal. Gov't Code § 12926(d); *Raines v. U.S. Healthworks Medical Group*, 15 Cal. 5th 268 (2023). The evidence demonstrates that race motivated the non-selection of Ellis and the hiring of a minority. Milo had been investigated for the lack of diversity in her head coaching hires and told the coaches she was being scrutinized for it; Snedden was told by the campus diversity officer that a candidate of color should be "strongly consider[ed]" and discussed the hire's "demographic" with Milo; Milo told Foster during Ellis's 2021 rehire that the administration wanted to hire a minority; Torrey Olson was forced to make a diversity hire when he wanted to bring back his male Caucasian Assistant Coach; Shah selected a firm whose website emphasized diversity; the firm contacted minority candidates before the job was posted; all four finalists were minority candidates; and a finalist with no head coaching experience was considered. (Ex. 4 (Milo II) 203:3-204:6; Ex. 8 (Shah) 75:5-76:17, 97:17-98:5; Ex. 1 (Foster) 298:14-302:25; Ex. 6 (Snedden) 123:22-124:22; Ex. 2 (Ellis) 82:12-86:5, 345:3-7, 367:17-370:24; Olson Decl. ¶ 6.) Ellis, with six years of head coaching experience and the highest GPAs in program history, received a 2 for head coaching experience and a 1 for student-athlete development. (Ex. 2 (Ellis) 339:5-341:16, 347:8-348:10, 353:17-354:24.) Whether those scores reflect judgment or a predetermined outcome is a question for the jury. *Reeves v. Safeway Stores*, 121 Cal. App. 4th at 113-16. Olson's declaration shows Milo made hiring demands by race and sex in so many words: she "insisted that I hire a woman, and said that ideally I should hire a Black woman." (Olson Decl. ¶ 6.) And Williamson, an experienced college head coach, explains that the coach who was hired had never run a Division II program and that a finalist lacked the Division II experience the posting required, while Ellis was more qualified than either. (Williamson Decl. ¶ 11.)

**F. Whether Plaintiffs were constructively discharged is a question of fact**

A constructive discharge occurs when an employer "intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1251 (1994). A "continuous pattern" of aggravated conduct suffices, id. at 1247, and the question is ordinarily one of fact. *Steele v. Youthful Offender Parole Board*, 162 Cal. App. 4th 1241, 1253-54 (2008). *In Colores v. Board of Trustees of California State University*, 105 Cal. App. 4th 1293 (2003), the court reversed summary judgment for the CSU where the plaintiff showed a campaign of retaliatory conduct following her complaints, holding that a jury could find the employer "intended to force [her] to resign." *Id.* at 1305-06. The test is objective, and whether a reasonable employee would have felt compelled to resign is "quintessentially a jury function." *Thompson v. Tracor Flight Systems, Inc.*, 86 Cal. App. 4th 1156, 1171 (2001). The length of time the employee stayed bears on how severe the conditions were, but it does not defeat the claim as a matter of law. *Valdez v. City of Los Angeles*, 231 Cal. App. 3d 1043, 1058 (1991).

Foster endured a public confrontation; written evaluations punishing him for the protest; a colleague telling the department he should be fired and that she would end his career; the loss of recruits through the cash-in-hand rule and the Tanaka refusal; isolation enforced by fear of a supervisor who remained in place for eighteen months with access to the investigation; a false report engineered by Milo's friend at a rival school; and a supervisor who told him "It's going to be this or even harder as it goes." He left for less money, no pension, and a state where he knew no one. (Ex. 1 (Foster) 95:25-

98:5, 311:14-19.) The employer knew: Snedden and Milo had Leonard's statements in writing, Diaz had Foster's complaints, and the Title IX office had his report about Leonard. Ellis was told, two days after Foster resigned, that the interim appointment every comparable assistant had received would not be his, learned the reason was his complaint, was excluded from the finalists by a firm that marked him down for the protest, and was left "in a back corner" as an assistant to no one.

Defendants' counterpoints go to weight. That Foster looked for other work while enduring the abuse is evidence the conditions were intolerable, not that they were tolerable; he applied to every California opening and wanted to stay until retirement. (Ex. 1 (Foster) 191:7-193:17, 200:5-23.) That he stayed a year after the rally reflects a market with 300 head coaching jobs and 400 to 500 applicants each, and his testimony that he would have seriously considered leaving even without an offer. (Ex. 1 (Foster) 119:3-25, 273:17-25.) That Ellis would have stayed had he been given the job he earned shows what drove him out. The cases Defendants cite involved a single bad evaluation or an ordinary denied promotion, not a year-long pattern directed at employees who had complained. *Turner*, 7 Cal. 4th at 1247; *Casenas v. Fujisawa USA, Inc.*, 58 Cal. App. 4th 101, 115 (1997). The knowledge element is not in doubt. The people who created these conditions were the Athletic Director, the Associate Athletic Director who supervised Plaintiffs, the Acting Athletic Director and a Vice President; their knowledge and intent are the CSU's. *Turner*, 7 Cal. 4th at 1251. The conditions were so intolerable that a reasonable employee would have been compelled to resign, and three other men did. Jim Saia, the Head Coach before Foster, left because he believed he would eventually be forced out and did not trust the administration to treat him fairly; he commuted to Los Angeles for ten years rather than stay. (Saia Decl. ¶¶ 5-6.) Assistant Coach

Kevin Williamson told CSUSM he was resigning because of the preferential treatment of the women's programs and the environment Milo created. (Williamson Decl. ¶ 8.) Track Coach Torrey Olson states that one of the reasons he left college coaching after seventeen years was the environment of favoritism Milo created. (Olson Decl. ¶ 8.)

### G. Triable Issues Exist on the Failure to Prevent Discrimination and Retaliation Claim, and the CSU's Failure to Investigate and Correct Independently Supports It (Second Cause of Action)

Defendants argue that the failure-to-prevent claim falls with the others. Because triable issues exist on discrimination, harassment and retaliation, this claim survives as well. *Trujillo v. North County Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998); *Taylor v. City of Los Angeles Department of Water & Power*, 144 Cal. App. 4th 1216, 1240 (2006). The record also independently supports it: CSUSM left Milo in place for eighteen months with access to the reports and witnesses, never responded to Foster's report about Leonard, let Leonard keep the SWA position and share Foster's office until after both Plaintiffs were gone, and at the first Title IX meeting the AVP for Faculty Affairs "had already heard Jen's side" and "accused [Plaintiffs] of basically being bad actors." (Ex. 2 (Ellis) 285:12-286:10.)

The duty imposed by section 12940(k) is affirmative, and it extends to retaliation. *Taylor*, 144 Cal. App. 4th at 1240. "Prompt investigation of a discrimination claim is a necessary step by which an employer meets its obligation to ensure a discrimination-free work environment." *Northrop Grumman Corp. v. Workers' Compensation Appeals Board*, 103 Cal. App. 4th 1021, 1035 (2002). The implementing regulation requires a complaint process that ensures "[a] timely response," "[i]mpartial and timely investigations by qualified personnel," "[a]ppropriate options for remedial

actions and resolutions," and "[t]imely closures." Cal. Code Regs. tit. 2, § 11023(b)(4). CSUSM's response was not prompt, not impartial and not corrective. Foster's report about Leonard received no response. Snedden's written record of Leonard's statements went to Milo, the administrator accused in the complaints, and nothing was done. The January 2023 report against Foster was memorialized and never investigated. The investigators did not consider, or interview anyone about, the players' complaint to the President. The investigation took roughly two years and led to the removal of Milo, Snedden and Leonard only after both Plaintiffs were gone. (See Resp. UMF 60; Ex. 8 (Shah) 129:6-132:2; Ex. 10 (Diaz) 13:21-17:18; Sutton Decl. ¶ 7; Seits Decl. ¶ 9.) Whether a two-year investigation that left the accused in charge of the people who accused her was a "timely" and "impartial" response is a question of fact.

### H. Triable issues exist on the Section 1983 First Amendment claim (Eighth Cause of Action)

#### 1. Plaintiffs engaged in protected speech

A public employee's speech is protected if it addresses a matter of public concern and is made as a citizen rather than pursuant to official duties, and the employer's interests do not outweigh the employee's. *Eng v. Cooley*, 552 F.3d 1062, 1070-72 (9th Cir. 2009). Defendants contest only the first two.

Public concern. Speech exposing discrimination by a public institution is "inherently" a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926-27 (9th Cir. 2004). Plaintiffs did not complain merely about their own pay or evaluations. They reported that a public university's Athletic Director had denied a championship team the opportunity to host an NCAA tournament because it was the men's team, and that male student-athletes were treated

worse than female student-athletes in admissions, travel and health protocols. (See Part II.C; Milo Decl. Ex. F.) Those are Title IX concerns affecting students, not internal grievances. That Plaintiffs raised the matter within the university does not defeat public concern; “speech on a matter of public concern need not be made to the public.” *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995). Plaintiffs also reported they were being discriminated and retaliated against, which is also protected activity and is not within their job descriptions. The cases Defendants cite do not apply because the individuals were only complaining about their own personal/personnel issues and not issues surrounding allegations of discrimination or retaliation.

Citizen speech. *Garcetti* protects speech unless it is “ordinarily within the scope of an employee’s duties.” *Lane v. Franks*, 573 U.S. 228, 240 (2014). A basketball coach’s duties are to coach; reporting Title IX violations to the Vice President is not among them, and “[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform.” *Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006). The scope of an employee’s duties is a question of fact. *Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121, 1127-29 (9th Cir. 2008). Defendants’ sole argument is that a university-wide policy “required” all employees to report discrimination. A generally applicable duty to report misconduct does not make every report an official duty; otherwise no public employee covered by such a policy could ever speak as a citizen about discrimination at work. The Ninth Circuit’s en banc decision in *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013), controls over the District of Kansas decision Defendants cite. Dahlia holds that when an employee “takes his job concerns to persons outside the work place” or outside the chain of command, or speaks “in direct contravention to his supervisor’s orders,” that

is strong evidence of citizen speech. *Id.* at 1074-76. Foster went over the Athletic Director's head to the Vice President, who acknowledged it was "possible that he was instructed not to call" her; he raised the matter with the President at the rally; he complained to the Title IX office; and he retained counsel and filed a tort claim. (See Part II.C; Milo Decl. ¶ 37 and Ex. F.) Ellis went to Human Resources and the Title IX Officer. (Ex. 2 (Ellis) 99:4-6.) These reports were not in their coaching job descriptions.

The protest. Defendants argue that the team's absence from the rally was not "expressive conduct" because no one understood it. The record is the opposite. Milo texted Foster the night before about "hoodies and sunglasses"; Leonard testified the students called it "boycotting"; Jimenez and the women's team knew why the men stayed away; Diaz had been told in advance; Milo testified "They knew men's basketball didn't show up for the pep rally." Snedden's evaluations describe the coaches as having "supported his student-athletes decision not to attend" rather than following Milo's "directive," which is the government's own acknowledgment of the message. Conduct is expressive when the actor intends a particularized message and "the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11 (1974); *Texas v. Johnson*, 491 U.S. 397, 404 (1989). A championship team boycotting its own send-off, after its administration refused to bid for it, in a department where everyone knew the reason, is such conduct. Foster told Milo, Snedden, Diaz and the President why the team would not attend, and both coaches told their players they supported their decision. Nor was the message confined to the department: parents called, the Union-Tribune contacted Foster, students posted a letter on social media, and the players told their families and other students why they stayed away. (Resp. UMF 17; Sutton Decl. ¶¶ 5-6; Seits Decl. ¶¶ 6-7.)

**2. Protected speech was a substantial or motivating factor, and each individual defendant participated**

Causation under Section 1983 may be shown by proximity in time, by the defendant's expressed opposition to the speech, and by false or pretextual explanations. Coszalter, 320 F.3d at 977; *Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 751-52 (9th Cir. 2001). All three are present. Each individual Defendant is liable for his or her own part in the retaliation, including "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978); *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011). Defendants' remaining argument simply incorporates their FEHA adverse-action points, which fail for the reasons stated above; under Section 1983 the question is whether the actions were "reasonably likely to deter" protected speech, Coszalter, 320 F.3d at 976, and lowered evaluations, lost recruits, a denied promotion and a public dressing-down plainly are. Defendants do not argue the *Pickering* balance or qualified immunity, and have waived those arguments for purposes of this motion.

## V. CONCLUSION

For the foregoing reasons, the motion should be denied in its entirety.

Dated: November 25, 2026 LAW OFFICES OF SUZY C. MOORE

By: /s/ Suzy C. Moore
Suzy C. Moore
Attorneys for Plaintiffs
B.J. FOSTER and ADAM ELLIS